1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# Exhibit 5

Plaintiffs' Motion for Partial Summary Judgment
Case No. 2:18-cv-00381

**GORDON E. R. TROY PC**
183 Highfield Dr., West Windsor, VT 05089
P.O. Box 1180 Shelburne, VT 05482
(802) 881-0640/Fax: (646) 588-1962

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

OEM License Agreement between Hyperion Entertainment CVBA and

Individual Computers Jens Schoenfeld GMBH

25 February 2013

Plaintiffs' Motion for Partial Summary Judgment
Case No. 2:18-cv-00381

**GORDON E. R. TROY PC**
183 Highfield Dr., West Windsor, VT 05089
P.O. Box 1180 Shelburne, VT 05482
(802) 881-0640/Fax: (646) 588-1962

## OEM LICENSE AGREEMENT

This agreement (this "Agreement") is made and entered into as of 25 February 2013

BY AND BETWEEN

**HYPERION ENTERTAINMENT CVBA** (hereafter : "HYPERION"), a Belgian corporation with its administrative seat at Gentsesteenweg 1150, Bus 12, B-1082 Brussels, Belgium and with company registration number 0466.380.552;

AND

**INDIVIDUAL COMPUTERS JENS SCHOENFELD GMBH** (hereafter : "Licensee"), a German corporation with its administrative seat at Im Zemmer 6, 52152 Simmerath, Germany and with company registration number HRB14429 (Amtsgericht Aachen).

RECITALS

**WHEREAS** HYPERION is developing the next release of its Amiga operating system called "Amiga OS 4.2" (hereafter: "OS 4") on the basis of its perpetual, worldwide, nearly exclusive license to the Classic Amiga OS as defined below;

**WHEREAS** INDIVIDUAL COMPUTERS has expressed an interest in licensing (the content of) "Kickstart 1.3" and "Kickstart 3.1" for use in flash-ROM of OCS/ECS accelerators only (with exception of A600 and A3000 models);

**NOW, THEREFORE**, for good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties hereto agree as follows:

### ARTICLE I.
### DEFINITIONS

1.01 **Definitions**. For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"**Classic Amiga OS**" means the operating system exclusively licensed to HYPERION largely based on the operating system shipped with the Commodore Amiga line of computers sold in the 1980s and early 90s by *inter alia* Commodore Business Machines ("CBM") including (without limitation) Kickstart 1.3 (V34.5) and Kickstart 3.1 (V40.063);

"**Confidential information**" means any business and technical information of a party hereto that is treated as confidential by such party and furnished to the other party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other party as confidential prior

HYP_002513

to  or concurrently with the transmission of such information, and, if conveyed orally, is identified orally as confidential prior to or concurrently with the transmission of such information and confirmed in writing within seven (7) days thereafter."

**Object Code**" means work in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code;

**"Parties"** means all entities and persons referred to in the header of this Agreement i.e. HYPERION and Licensee;

**"Source Code"** means work when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the (English) language;

**"Software"** or "**the Software**" means Kickstart 1.3 and Kickstart 3.1 in Object Code format;

**"Term"** means the term of this Agreement, which is defined in Article 8.01 hereof.


### ARTICLE II.
### APPOINTMENT.

2.01 **Appointment. During the Term** HYPERION grants Licensee a world-wide, non-exclusive, non-assignable (even by operation of law) limited OEM license to distribute and commercialize the Software in flashrom (Object Code only) as part of a one specific accelerator for OCS/ECS capable Amiga computers (excluding Amiga 600 and Amiga 3000 models). There are no limitations as to the number of units of accelerators sold. HYPERION furthermore grants Licensee the right to transmit a copy of the Source Code version of AmigaOS component "scsi.device" V40.5 (sept. 13th, 1993) to Herr HEINZ WROBEL living in Karlstr. 16, 82131 Gauting, Germany, and to TONI WILEN living in Sudentie 4, 13600 Hämeenlinna, Finland, for the purpose of modifying the Source-Code and Object Code versions of "scsi.device". Finally, Licensee is furthermore permitted to redistribute AmigaOS component "scsi.device" in a "patched" version i.e. in modified form.

2.02 **Restrictions on use.** Licensee shall not:

(a) rent, lease, lend, encumber, pledge, copy, make available or distribute the Software to any third party, except as expressly permitted by this Agreement;

(b) remove, modify or obscure any copyright, trademark or other proprietary rights notices (if any) that appear on the Software or that appear during use or installation of the Software;

2.03 **Ownership.** All Licenses granted to Licensee under this Agreement are subject to Licensee's compliance with the terms and conditions of this Agreement.  This Agreement does not transfer any ownership rights in the Software and HYPERION reserves all rights not expressly granted.

2.04 **Press-releases.** Subject to common approval, the Parties shall release a joint press-release announcing this Agreement.

### ARTICLE III.
### OBLIGATIONS OF HYPERION

3.01 **Provision of the Software.** Following payment of the minimum guarantee as set out in article 4.02 hereof, HYPERION shall immediately provide Licensee with the Software.

3.02 **Follow-up agreement**. HYPERION grants licensee a right of option to negotiate in good faith the terms of a follow up agreement covering Kickstart(s) for Amiga computer main-boards.

### ARTICLE IV.
### OBLIGATIONS OF LICENSEE

4.01 **Licensee fee**. Licensee shall pay HYPERION a one time, lump sum licensee fee of fifteen hundred (1500) euro (excluding VAT).

4.02 **Payment Terms**. Licensee shall pay the full amount of all HYPERION invoices by IBAN bank wire transfer, all transfer costs for Licensee.

4.03 **Compliance with License Requirements.** Licensee will inform Licensee's employees, agents, and other individuals who have access to the Software that the Software: (1) is licensed by HYPERION; (2) may only be used subject to the terms and conditions contained in this Agreement; and (3) may not be copied, transferred or otherwise used in violation of such terms and conditions. Licensee will use all commercially reasonable efforts to prevent any unauthorized distribution, copying, use, or pirating of the Software.

### ARTICLE V.
### WARRANTIES AND INDEMNIFICATIONS

5.01 **Warranty and Covenant of Original Development by HYPERION**.

(I) HYPERION represents, warrants and covenants that: (a) it has and shall have sufficient rights to all intellectual property rights in the Software under copyright, trademark, trade secret, and other applicable law; (b) the Software delivered or licensed to Licensee hereunder is and shall be of original development by (employees of) HYPERION (in the conduct of their duties as employees) or by third parties who prepared such materials for HYPERION pursuant to a contract between HYPERION and said third party and who assigned to HYPERION his or its right, title and interest in the Software to the extent required for the purpose of this Agreement; (c) the Software does not and shall not infringe or otherwise violate any copyright or trade secret of any third party anywhere in the world with the exception of software patents.

(II) If HYPERION receives information concerning an infringement or misappropriation claim related to (part of) the Software, HYPERION shall, at its expense, either (1) procure for Licensee the right to continue to use the allegedly infringing Software, or (2) modify the Software or replace it with a functional equivalent, to make it non-infringing, in which case Licensee must immediately cease using the allegedly infringing Software. If it is commercially unreasonable to procure a license or modify or replace the infringing subset of the Software, HYPERION may opt to remove the infringing functionality from the Software.

If, as a result of an infringement or misappropriation claim, Licensee's use of the Software is enjoined by a court of competent jurisdiction, HYPERION will, at its option, either procure the right to continue its use, replace the Software with a functional equivalent, or modify the Software to make it non-infringing; and in the event that HYPERION is unable to provide any of the above through commercially reasonable efforts, HYPERION will refund the amount paid, and terminate the license.  The rights and remedies granted to Licensee under this Article 5.01 state HYPERION's entire liability and Licensee's exclusive remedy with respect to any claim of infringement of the rights of a third party.

5.02 **Limited Warranty and Disclaimers**.

(a) The Software is licensed to Licensee "as is". The foregoing states HYPERION's entire liability and Licensee's exclusive remedy for any breach of the limited warranty described in Article 5.02 hereof.

(b) **NO OTHER WARRANTIES.**  EXCEPT FOR THE LIMITED WARRANTY PROVIDED IN ARTICLE 5.02 (a) ABOVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, HYPERION DOES NOT MAKE ANY REPRESENTATIONS OR EXPRESS WARRANTIES AND DISCLAIMS ALL WARRANTIES, DUTIES AND CONDITIONS WITH RESPECT TO THE SOFTWARE, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, LACK OF VIRUSES, ACCURACY OR COMPLETENESS OF RESPONSES OR RESULTS, OR CORRESPONDENCE TO DESCRIPTION.  THERE ARE NO WARRANTIES OF TITLE, NON-INFRINGEMENT OR QUIET ENJOYMENT OR QUIET POSSESSION WITH RESPECT TO THE SOFTWARE.  THE ENTIRE RISK AS TO THE QUALITY OF OR ARISING OUT OF USE OR PERFORMANCE OF THE SOFTWARE, IF ANY, REMAINS WITH LICENSEE.

(c) **Fault Tolerance.** The Software is not fault-tolerant and is not designed, manufactured or intended for use with on-line control equipment in hazardous environments requiring fail-safe performance, such as in the operation of nuclear facilities, aircraft navigation or communication systems, air traffic control, direct life support machines, or weapons systems, in which the failure of the Software could lead directly to death, personal injury, or severe physical, property or environmental damage ("High Risk Activities"). HYPERION SPECIFICALLY DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY OF FITNESS FOR HIGH RISK ACTIVITIES.

5.03 **Indemnification by HYPERION**. HYPERION shall indemnify and hold Licensee and Herr HEINZ WROBEL living in Karlstr. 16, 82131 Gauting, Germany, and TONI WILEN living in Sudentie 4, 13600 Hämeenlinna, Finland, harmless from and against all claims, suits, demands, actions, judgments, penalties, damages, costs and expenses (including attorney's fees and costs), losses or liabilities of any kind arising from a claim that the Software infringes a copyright or other intellectual property right of any other person anywhere in the world (except to the extent such infringement or violation is due to Licensee or is related to a software patent).

5.04 **Organization and Standing.** HYPERION is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium. INDIVIDUAL COMPUTERS JENS SCHOENFELD GmbH is a corporation duly organized, validly existing and in good standing under the laws of Germany.

5.05 **Power to grant rights by HYPERION**. HYPERION represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by HYPERION does not and shall not violate any separate agreement, right or obligation existing between HYPERION and any third party.

## ARTICLE VI.
## LIMITATION OF LIABILITY

(a) HYPERION's liability under this Agreement will be limited, to the maximum extent permitted by applicable law, to direct damages up to five thousand (5000) euro. The limitations contained in this Article VI will not apply with respect to the following in connection with the performance of this Agreement: (1) HYPERION's liability for damages for gross negligence of willful misconduct, to the extent caused by HYPERION or HYPERION's agent and awarded by a court of final adjudication; and (2) HYPERION's obligations under Article VII (Confidentiality).

(b) TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER LICENSEE NOR HYPERION, NOR THE PARTIES' RESPECTIVE AFFILIATES OR SUPPLIERS, WILL BE LEGALLY RESPONSIBLE FOR ANY INDIRECT DAMAGES (INCLUDING, WITHOUT LIMITATION, CONSEQUENTIAL, SPECIAL, PUNITIVE, OR INCIDENTAL DAMAGES, DAMAGES FOR LOSS OF PROFITS OR REVENUES, LOSS OF PRIVACY, BUSINESS INTERRUPTION, OR LOSS OF BUSINESS INFORMATION), ARISING OUT OF THE USE OF OR INABILITY TO USE THE SOFTWARE, OR OTHERWISE UNDER OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR IF SUCH POSSIBILITY WAS REASONABLY FORESEEABLE. This exclusion of liability in this Article VI (b) does not apply to either party's liability to the other for violation of its confidentiality obligation or of the other party's intellectual property rights.

(c) Except as specified expressly in this Article VI, the limitations on and exclusions of liability for damages in this Agreement apply regardless of whether the liability is based on breach of contract, tort (including negligence), strict or product liability, breach of warranty, or any other legal theory, and even if any remedy fails of its essential purpose.

## ARTICLE VII.
## CONFIDENTIALITY

(a) Each party may disclose to the other party Confidential Information as may be necessary to further the performance of this Agreement. Each party agrees to treat the other's Confidential Information in the manner prescribed herein.

(b) Licensee and HYPERION shall protect the other party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other party in writing, each party may disclose Confidential Information of the other party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each party shall require each such employee or agent to enter into a written non-disclosure agreement containing provisions substantially consistent with the terms hereof

prior to the disclosure of Confidential Information to such employee or agent. Each party shall treat the Confidential Information of the other party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each party shall return to the other, or, if so requested, destroy all Confidential Information of the other party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to either party's Confidential Information to the extent that it:

(I) is within or later falls within the public domain through no fault of the party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving party;

(IV) is independently developed by or for the receiving party without use of the Confidential Information.

(d) In the event any party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such party shall (I) immediately notify the party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

## ARTICLE VIII.
## TERM; TERMINATION

8.01 **Term**. This Agreement shall continue for a period of ten (10) years unless terminated previously pursuant to this Agreement.

8.02 **Termination for Material Breach**.  Either party may, at its option, terminate this Agreement in the event of a Material Breach by the other party. Such termination may be effected only through a written notice to the other party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of said period. The claim of material breach justifying termination shall be limited to the specific breach set forth in the above written notice as explained, supported and negated by evidence.

8.03 **Termination in the event of bankruptcy**. If either party files a petition in bankruptcy

for liquidation, or ceases doing business in the ordinary course, then the other party shall have the right to terminate this Agreement upon thirty (30) days written notice.

8.04 **Consequences of Termination**. Upon termination of this Agreement, the license granted to Licensee pursuant to article II hereof shall terminate forthwith. Articles V, VI, VII, VIII and IX shall survive the termination of this Agreement. Upon termination of this Agreement other than for Material Breach by Licensee, Licensee, its distributors and resellers may continue to exercise all of the rights and licenses granted herein in order to (a) furnish maintenance and technical support for the Software (b) fill orders that Licensee or its distributors and resellers have received prior to such date, and (c) distribute their inventory of existing as of such date.

**ARTICLE IX.**
**MISCELLANEOUS**

9.01 **Entire Agreement.** This Agreement collectively sets forth the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the Parties with respect to the subject matter hereof, and neither of the Parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein.

9.02 **Independent Contractors**. In making and performing this Agreement, Licensee and HYPERION act and shall act at all times as independent contractors and nothing contained in this Agreement shall be construed or implied to create an agency, partnership or employer and employee relationship between Licensee and HYPERION. At no time shall either party make commitments or incur any charges or expenses for or in the name of the other party.

9.03 **Amendments; Modifications**. No amendment, modification or attempt to supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by Licensee and HYPERION or, in the case of a waiver, by or on behalf of the party waiving compliance. No waiver by any party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

9.04 **Assignment**. Licensee shall not assign this Agreement to any third party without HYPERION's prior written approval which shall be not withheld unreasonably.

9.05 **Severability**. The provisions of this Agreement shall be severable, and if any of them are held invalid or unenforceable for any reason, such provision shall be adjusted to the minimum extent necessary to cure such invalidity. The invalidity or unenforceability of one or more of the provisions contained in this Agreement shall not affect any other provisions of this Agreement.

9.06 **Waivers**. The waiver of any breach of any provision of this Agreement or failure to enforce any provision hereof shall not operate or be construed as a waiver of any subsequent breach.

ATTORNEYS' EYES ONLY

9.07 **Governing Law**. This Agreement shall be governed by and interpreted in accordance with the internal laws of Belgium without regard to conflicts of laws principles.

9.08 **Forum**. The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the courts of Brussels, Belgium and each of the parties hereby submits itself to the exclusive jurisdiction and venue of said courts for the purposes of such lawsuit. This choice of jurisdiction and venue does not prevent either party from seeking injunctive relief with respect to a violation of intellectual property rights, confidentiality obligations or enforcement or recognition of any award or order in any appropriate jurisdiction.

9.09 **Counterparts**. This Agreement may be executed in any number of counterparts but at least one for each party, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

9.10 **Signatures by Facsimile**. Any facsimile signature of any party hereto shall constitute a legal, valid and binding execution hereof by such party.

9.11 **Construction**. This Agreement is the product of joint draftmanship and shall not be construed against one party more strictly than against the other.

9.12 **Effect**. The Agreement shall be binding upon and inure to the benefit of each party hereto, and their successors and assigns.

9.13 **Headings**. The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

**IN WITNESS WHEREOF**, the Parties, by their authorized representatives, have executed this Agreement.

FOR INDIVIDUAL COMPUTERS JENS SCHOENFELD GMBH

BY:_____

NAME (PRINTED)_____

TITLE _____

FOR HYPERION ENTERTAINMENT CVBA

BY: _____

NAME (PRINTED) _BEN HERMANS_

TITLE _Director Legal_

**IN WITNESS WHEREOF**, the Parties, by their authorized representatives, have executed this Agreement.

FOR INDIVIDUAL COMPUTERS JENS SCHOENFELD GMBH

BY: _____

NAME (PRINTED) _Jens Schönfeld_

TITLE _Geschäftsführer_


FOR HYPERION ENTERTAINMENT CVBA

BY: _____

NAME (PRINTED) _BEN HERMANS_

TITLE _Director Legal_

ATTORNEYS' EYES ONLY                    HYP_002521(a)

OEM License Agreement – ACA Accelerators

between Hyperion Entertainment CVBA and

Individual Computers Jens Schoenfeld GMBH

April 11, 2016

Plaintiffs' Motion for Partial Summary Judgment
Case No. 2:18-cv-00381

GORDON E. R. TROY PC
183 Highfield Dr., West Windsor, VT 05089
P.O. Box 1180 Shelburne, VT 05482
(802) 881-0640/Fax: (646) 588-1962

## <u>OEM LICENSE AGREEMENT – ACA ACCELERATORS</u>

This agreement (this "Agreement") is made and entered into as of **April 11, 2016** (the "Effective Date")

BY AND BETWEEN

**HYPERION ENTERTAINMENT CVBA** (hereafter : "HYPERION"), a Belgian corporation with its administrative seat at Tervurenlaan 34, 1040 Brussels, Belgium and with company registration number 0466.380.552;

AND

**INDIVIDUAL COMPUTERS GMBH** (hereafter : "Licensee"), a German corporation with its administrative seat at Im Zemmer 6, 52152 Simmerath, Germany, and with company registration number (German: "Handelsregistereintrag") HRB 14429;

*Jointly referred to as "Parties" and individually as "Party";*

RECITALS

**WHEREAS** HYPERION is developing the next release of its Amiga operating system called "Amiga OS 4.2" (hereafter: "OS 4") on the basis of its perpetual, worldwide, nearly exclusive license to the Classic Amiga OS as defined below;

**WHEREAS** INDIVIDUAL COMPUTERS has expressed an interest in licensing (the content of) "Kickstart 1.2", "Kickstart 1.3", "Workbench 1.3" and "Workbench 3.1" for use in flash-ROM OCS/ECS accelerators only (with exception of A3000 models);

**NOW, THEREFORE**, intending to be legally bound, the Parties hereto agree as follows:

### ARTICLE I.
### DEFINITIONS

1.01 **Definitions**. For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

"**Classic Amiga OS**" means the operating system exclusively licensed to HYPERION largely based on the operating system shipped with the Commodore Amiga line of computers sold in the 1980s and early 90s by *inter alia* Commodore Business Machines ("CBM") including (without limitation) Kickstart 1.2, Kickstart 1.3, Workbench 1.3 and Workbench 3.1;

"**Confidential information**" means any business and technical information of a Party hereto that is treated as confidential by such Party and furnished to the other Party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where

such information, if in writing, is identified in writing to the other Party as confidential prior to  or concurrently with the transmission of such information, and, if conveyed orally, is identified orally as confidential;

Object Code" means work in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code;

"Source Code" means work when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the (English) language;

"Software" or "the Software" means Kickstart 1.2, Kickstart 1.3, Workbench 1.3 and Workbench 3.1 in Object Code format as described in Exhibit I hereof;

"Term" means the term of this Agreement, which is defined in Article 8.01 hereof.


## ARTICLE II.
## APPOINTMENT.

2.01 **Appointment.** During the Term HYPERION grants Licensee a world-wide, non-exclusive, non-assignable (even through operation of law) limited OEM license to distribute and commercialize the Software in flash-rom (Object Code only) as part of a specific accelerator for OCS/ECS capable Amiga's (including Amiga 600 but excluding Amiga 3000 models). There are no limitations as to the number of units of accelerators sold. For the avoidance of doubt, the accelerators in question are: the ACA500plus, the ACA2000, the ACA1000 and the ACA600. Licensee shall make one (1) fully working production grade unit of each ACA accelerator model (including the licensed Software) available to HYPERION for verification of quality.

2.02 **Appointment.** The scope of the existing license agreement between the Parties, as concluded on February 25th, 2013, relating to the distribution in Object Form of Kickstart 1.3 and Kickstart 3.1 is extended to cover the ACA600 accelerator.

2.03 **Restrictions on use.** Licensee shall not:

 (a) rent, lease, lend, encumber, pledge, copy, make available or distribute the Software to any third party, except as expressly permitted by this Agreement;

(b) remove, modify or obscure any copyright, trademark or other proprietary rights notices (if any) that are present or appear on the Software or that appear during use or installation of the Software;

2.04 **Ownership.** All Licenses granted to Licensee under this Agreement are subject to Licensee's compliance with the terms and conditions of this Agreement.  This Agreement does not transfer any ownership rights in the Software and HYPERION reserves all rights not expressly granted.

ATTORNEYS' EYES ONLY                HYP_002479

2.05 **Press-releases**. Subject to common approval, the Parties shall release a joint press-release announcing this Agreement.

### ARTICLE III.
### OBLIGATIONS OF HYPERION

3.01 **Provision of the Software.** Following payment of the lump sum license fee as set out in article 4.01 hereof, HYPERION shall immediately provide Licensee with the Software.

3.02 **Follow-up agreement**. HYPERION grants licensee a right of option to negotiate in good faith the terms of a follow up agreement covering Kickstart(s) and Workbench for Amiga computer main-boards.

### ARTICLE IV.
### OBLIGATIONS OF LICENSEE

4.01 **Licensee fee**. Licensee shall pay HYPERION a one time, lump sum licensee fee of two thousand and five hundred (2500) EUR (excluding VAT and any withholding taxes).

4.02 **Payment Terms**. Licensee shall pay the full amount of all HYPERION invoices by IBAN bank wire transfer within thirty (30) days, all transfer costs are born by Licensee.

4.03 **Compliance with License Requirements.** Licensee will inform Licensee's employees, agents, and other individuals who have access to the Software that the Software: (1) is licensed by HYPERION; (2) may only be used subject to the terms and conditions contained in this Agreement; and (3) may not be copied, transferred or otherwise used in violation of such terms and conditions. Licensee will use all commercially reasonable efforts to prevent any unauthorized distribution, copying, use, or pirating of the Software.

### ARTICLE V.
### WARRANTIES AND INDEMNIFICATIONS

5.01 **Warranty and Covenant of Original Development by HYPERION.**

(I) HYPERION represents, warrants and covenants that: (a) it has and shall have sufficient rights to all intellectual property rights in the Software under copyright, trademark, trade secret, and other applicable law; (b) the Software delivered or licensed to Licensee hereunder is and shall be of original development by (employees of) HYPERION (in the conduct of their duties as employees) or by third parties who prepared such materials for HYPERION pursuant to a contract between HYPERION and said third party and who assigned to HYPERION his or its right, title and interest in the Software to the extent required for the purpose of this Agreement; (c) the Software does not and shall not infringe or otherwise violate any copyright or trade secret of any third party anywhere in the world with the exception of software patents.

(II) If HYPERION receives information concerning an infringement or misappropriation claim related to (part of) the Software, HYPERION shall, at its expense, either (1) procure for Licensee the right to continue to use the allegedly infringing Software, or (2) modify the Software or replace it with a functional equivalent, to make it non-infringing, in which case Li-

censee must immediately cease using the allegedly infringing Software. If it is commercially unreasonable to procure a license or modify or replace the infringing subset of the Software, HYPERION may opt to remove the infringing functionality from the Software. If, as a result of an infringement or misappropriation claim, Licensee's use of the Software is enjoined by a court of competent jurisdiction, HYPERION will, at its option, either procure the right to continue its use, replace the Software with a functional equivalent, or modify the Software to make it non-infringing; and in the event that HYPERION is unable to provide any of the above through commercially reasonable efforts, HYPERION will refund the amount paid, and terminate the license. The rights and remedies granted to Licensee under this Article 5.01 state HYPERION's entire liability and Licensee's exclusive remedy with respect to any claim of infringement of the rights of a third party.

5.02 **Limited Warranty and Disclaimers**.

(a) The Software is licensed to Licensee "as is". The foregoing states HYPERION's entire liability and Licensee's exclusive remedy for any breach of the limited warranty described in Article 5.02 hereof.

(b) **NO OTHER WARRANTIES.** EXCEPT FOR THE LIMITED WARRANTY PROVIDED IN ARTICLE 5.02 (a) ABOVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, HYPERION DOES NOT MAKE ANY REPRESENTATIONS OR EXPRESS WARRANTIES AND DISCLAIMS ALL WARRANTIES, DUTIES AND CONDITIONS WITH RESPECT TO THE SOFTWARE, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, LACK OF VIRUSES, ACCURACY OR COMPLETENESS OF RESPONSES OR RESULTS, OR CORRESPONDENCE TO DESCRIPTION. THERE ARE NO WARRANTIES OF TITLE, NON-INFRINGEMENT OR QUIET ENJOYMENT OR QUIET POSSESSION WITH RESPECT TO THE SOFTWARE. THE ENTIRE RISK AS TO THE QUALITY OF OR ARISING OUT OF USE OR PERFORMANCE OF THE SOFTWARE, IF ANY, REMAINS WITH LICENSEE.

(c) **Fault Tolerance.** The Software is not fault-tolerant and is not designed, manufactured or intended for use with on-line control equipment in hazardous environments requiring fail-safe performance, such as in the operation of nuclear facilities, aircraft navigation or communication systems, air traffic control, direct life support machines, or weapons systems, in which the failure of the Software could lead directly to death, personal injury, or severe physical, property or environmental damage ("High Risk Activities"). HYPERION SPECIFICALLY DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY OF FITNESS FOR HIGH RISK ACTIVITIES.

5.03 **Organization and Standing.** HYPERION is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium. INDIVIDUAL COMPUTERS GmbH is a corporation duly organized, validly existing and in good standing under the laws of Germany.

5.04 **Power to grant rights by HYPERION**. HYPERION represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by HYPERION does not and shall not violate any separate agreement, right or obligation existing between HYPERION and any third party.

ATTORNEYS EYES ONLY

## ARTICLE VI.
## LIMITATION OF LIABILITY

(a) HYPERION's liability under this Agreement will be limited, to the maximum extent permitted by applicable law, to direct damages up to five thousand (5000) euro. The limitations contained in this Article VI will not apply with respect to the following in connection with the performance of this Agreement: (1) HYPERION's liability for damages for gross negligence of willful misconduct, to the extent caused by HYPERION or HYPERION's agent and awarded by a court of final adjudication; and (2) HYPERION's obligations under Article VII (Confidentiality).

(b) TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER LICENSEE NOR HYPERION, NOR THE PARTIES' RESPECTIVE AFFILIATES OR SUPPLIERS, WILL BE LEGALLY RESPONSIBLE FOR ANY INDIRECT DAMAGES (INCLUDING, WITHOUT LIMITATION, CONSEQUENTIAL, SPECIAL, PUNITIVE, OR INCIDENTAL DAMAGES, DAMAGES FOR LOSS OF PROFITS OR REVENUES, LOSS OF PRIVACY, BUSINESS INTERRUPTION, OR LOSS OF BUSINESS INFORMATION), ARISING OUT OF THE USE OF OR INABILITY TO USE THE SOFTWARE, OR OTHERWISE UNDER OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR IF SUCH POSSIBILITY WAS REASONABLY FORESEEABLE. This exclusion of liability in this Article VI (b) does not apply to either Party's liability to the other for violation of its confidentiality obligation or of the other Party's intellectual property rights.

(c) Except as specified expressly in this Article VI, the limitations on and exclusions of liability for damages in this Agreement apply regardless of whether the liability is based on breach of contract, tort (including negligence), strict or product liability, breach of warranty, or any other legal theory, and even if any remedy fails of its essential purpose.


## ARTICLE VII.
## CONFIDENTIALITY

(a) Each Party may disclose to the other Party Confidential Information as may be necessary to further the performance of this Agreement. Each Party agrees to treat the other's Confidential Information in the manner prescribed herein.

(b) Licensee and HYPERION shall protect the other Party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other Party in writing, each Party may disclose Confidential Information of the other Party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each Party shall require each such employee or agent to enter into a written non-disclosure agreement containing provisions substantially consistent with the terms hereof prior to the disclosure of Confidential Information to such employee or agent. Each Party shall treat the Confidential Information of the other Party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of

ATTORNEYS EYES ONLY                    HYP_002482

care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each Party shall return to the other, or, if so requested, destroy all Confidential Information of the other Party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to either Party's Confidential Information to the extent that it:

(I) is within or later falls within the public domain through no fault of the Party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving Party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving Party;

(IV) is independently developed by or for the receiving Party without use of the Confidential Information.

(d) In the event any Party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such Party shall (I) immediately notify the Party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such Party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the Party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

## ARTICLE VIII.
## TERM; TERMINATION

8.01 **Term**. This Agreement shall continue for a period of ten (10) years as of the Effective Date unless terminated previously pursuant to this Agreement. The existing license agreement concluded by the Parties on February 25th, 2013, relating to the distribution in Object Form of Kickstart 1.3 and Kickstart 3.1 as amended by this Agreement shall remain in force for as long as this Agreement remains in force.

8.02 **Termination for Material Breach**. Either Party may, at its option, terminate this Agreement in the event of a Material Breach by the other Party. Such termination may be effected only through a written notice to the other Party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the Party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of said period. The claim of material breach justifying termination shall be limited to the specific breach set forth in the above written notice as explained, supported by evidence.

ATTORNEYS' EYES ONLY              HYP_002483

8.03 **Termination in the event of bankruptcy**. If either Party files a petition in bankruptcy for liquidation, or ceases doing business in the ordinary course, then the other Party shall have the right to terminate this Agreement upon thirty (30) days written notice.

8.04 **Consequences of Termination**. Upon termination of this Agreement, the license granted to Licensee pursuant to article II hereof shall terminate forthwith. Articles V, VI, VII, VIII and IX shall survive the termination of this Agreement. Upon termination of this Agreement other than for Material Breach by Licensee, Licensee, its distributors and resellers may continue to exercise all of the rights and licenses granted herein in order to (a) furnish maintenance and technical support for the Software (b) fill orders that Licensee or its distributors and resellers have received prior to such date, and (c) distribute their inventory of existing as of such date.

## ARTICLE IX.
## MISCELLANEOUS

9.01 **Entire Agreement.** This Agreement collectively sets forth the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the Parties with respect to the subject matter hereof, and neither of the Parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein. The existing license agreement concluded by the Parties on February 25th, 2013, relating to the distribution in Object Form of Kickstart 1.3 and Kickstart 3.1 shall remain in force as amended by this Agreement.

9.02 **Independent Contractors**. In making and performing this Agreement, Licensee and HYPERION act and shall act at all times as independent contractors and nothing contained in this Agreement shall be construed or implied to create an agency, partnership or employer and employee relationship between Licensee and HYPERION. At no time shall either Party make commitments or incur any charges or expenses for or in the name of the other Party.

9.03 **Amendments; Modifications**. No amendment, modification or attempt to supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by Licensee and HYPERION or, in the case of a waiver, by or on behalf of the Party waiving compliance. No waiver by any Party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

9.04 **Assignment**. Licensee shall not assign this Agreement to any third party without HYPERION's prior written approval which shall be not withheld unreasonably.

9.05 **Governing Law**. This Agreement shall be governed by and interpreted in accordance with the internal laws of Belgium without regard to conflicts of laws principles.

9.06 **Forum**. The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the courts of Brussels, Belgium and each of the parties hereby submits itself to the exclusive jurisdiction and

ATTORNEYS EYES ONLY                    HYP_002484

venue of said courts for the purposes of such lawsuit. This choice of jurisdiction and venue does not prevent either Party from seeking injunctive relief with respect to a violation of intellectual property rights, confidentiality obligations or enforcement or recognition of any award or order in any appropriate jurisdiction.

9.07 **Counterparts**. This Agreement may be executed in any number of counterparts but at least one for each Party, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

9.08 **Signatures by Facsimile**. Any facsimile signature of any Party hereto shall constitute a legal, valid and binding execution hereof by such Party.

9.09 **Construction**. This Agreement is the product of joint draftmanship and shall not be construed against one Party more strictly than against the other.

9.10 **Effect**. The Agreement shall be binding upon and inure to the benefit of each Party hereto, and their successors and assigns.

9.11 **Headings**. The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

ATTORNEYS' EYES ONLY

**IN WITNESS WHEREOF**, the Parties, by their authorized representatives, have executed this Agreement.


FOR INDIVIDUAL COMPUTERS GMBH

BY:_____

NAME (PRINTED) _Jens Schönfeld_

TITLE _Geschäftsführer_


FOR HYPERION ENTERTAINMENT CVBA

BY:_____

NAME (PRINTED) _____

TITLE _____


FOR HYPERION ENTERTAINMENT CVBA

BY:_____

NAME (PRINTED) _____

TITLE _____


9

ATTORNEYS EYES ONLY                    HYP_002486

## EXHIBIT I

Workbench 3.1 shall contain all files of the original Workbench 3.1 floppies including (without limitation):

- Install
- Workbench
- Extras
- Locale
- Fonts
- Storage

Licensee has taken it upon itself to device a method to incorporate said files in a flash-rom as part of the specific accelerators.

Licensee acknowledges that he is aware of the scope and functionality the other elements of the Software Kickstart 1.2, Kickstart 1.3 and Workbench 1.3 and is satisfied that Hyperion can deliver the required files to it in the same manner that Hyperion can deliver an unaltered Workbench 3.1 to it.

ATTORNEYS EYES ONLY                    HYP_002487

OEM License Agreement – Commodore A1200 Reloaded

between Hyperion Entertainment CVBA and

Individual Computers Jens Schoenfeld GMBH

April 24, 2017

Plaintiffs' Motion for Partial Summary Judgment
Case No. 2:18-cv-00381

**GORDON E. R. TROY PC**
183 Highfield Dr., West Windsor, VT 05089
P.O. Box 1180 Shelburne, VT 05482
(802) 881-0640/Fax: (646) 588-1962

## OEM LICENSE AGREEMENT – COMMODORE A1200 RELOADED

This agreement (this "Agreement") is made and entered into as of April 24, 2017 ("Effective Date");

BY AND BETWEEN

**HYPERION ENTERTAINMENT CVBA** (hereafter : "HYPERION"), a Belgian corporation with its administrative seat at Tervurenlaan 34, 1040 Brussels, Belgium and with company registration number 0466.380.552;

AND

**INDIVIDUAL COMPUTERS GMBH** (hereafter : "Licensee"), a German corporation with its administrative seat at Im Zemmer 6, 52152 Simmerath, Germany, and with company registration number (German: "Handelsregistereintrag") HRB 14429;

*Jointly referred to as "Parties" and individually as "Party";*

RECITALS

**WHEREAS** HYPERION is developing the next release of its Amiga operating system called "Amiga OS 4.2" (hereafter: "OS 4") on the basis of its perpetual, worldwide, nearly exclusive license to the Classic Amiga OS as defined below;

**WHEREAS** INDIVIDUAL COMPUTERS has expressed an interest in licensing "Workbench 3.1" to be shipped as an OEM version with its "Commodore A1200 Reloaded" hardware;

**WHEREAS** the Parties already envisage negotiating in good faith on extending the scope of this license;

**NOW, THEREFORE**, intending to be legally bound, the Parties hereto agree as follows:

### ARTICLE I.
### DEFINITIONS

1.01 **Definitions**. For purposes of this Agreement, in addition to capitalized terms defined elsewhere in this agreement, the following defined terms shall have the meanings set forth below:

**"Classic Amiga OS"** means the operating system exclusively licensed to HYPERION largely based on the operating system shipped with the Commodore Amiga line of computers sold in the 1980s and early 90s by *inter alia* Commodore Business Machines ("CBM") including (without limitation) Kickstart 1.2, Kickstart 1.3, Workbench 1.3 and Workbench 3.1;

ATTORNEYS' EYES ONLY                    HYP_002488

**"Confidential information"** means any business and technical information of a Party hereto that is treated as confidential by such Party and furnished to the other Party, and which includes but is not limited to computer programs, Source code, Object code, algorithms where such information, if in writing, is identified in writing to the other Party as confidential prior to or concurrently with the transmission of such information, and, if conveyed orally, is identified orally as confidential prior to or concurrently with the transmission of such information;

**"Hardware"** means the hardware developed by Licensee under the name of "Commodore A1200 Reloaded";

**Object Code"** means work in a machine readable form that is not convenient to human understanding of the program logic, and that can be executed by a computer using the appropriate operating system without compilation or interpretation. Object Code specifically excludes Source Code;

**"Source Code"** means work when written in a form or language understandable to humans, generally in a higher level computer language, and further including embedded comments in the (English) language;

**"Software"** or **"the Software"** means an unaltered ("vanilla") copy of AmigaOS 3.1 as described in Annex I hereof;

**"Term"** means the term of this Agreement, which is defined in Article 8.01 hereof;

## ARTICLE II.
## APPOINTMENT.

**2.01 Appointment.** During the Term HYPERION grants Licensee a world-wide, non-exclusive, non-assignable (even by operation of law) limited OEM license to distribute and commercialize the Software in flash-rom (Object Code only) jointly with the Hardware. Licensee shall make one (1) fully working production grade unit of the Hardware (including the licensed Software) available to HYPERION to verify quality.

**2.02 Per Unit License Fee and Minimum Order.** Licensee irrevocably commits to immediately license and order four thousand six-hundred units (4600) units of the Software upon execution of this Agreement by HYPERION at a fixed royalty rate of one EUR fifty cents (1,5) EUR per unit, payable within thirty (30) days upon receipt of invoice. All amounts are exclusive of VAT or any withholding taxes.

**2.03 Additional Orders.** During the Term of this Agreement, Licensee shall be allowed to acquire additional licenses of the Software "as is" and at the pricing fixed in article 2.02 hereof. To reduce administrative overhead, minimum order size shall at least be for two hundred (200) units.

**2.04 Restrictions on use.** Licensee shall not:

 (a) rent, lease, lend, encumber, pledge, copy, make available or distribute the Software to any

ATTORNEYS EYES ONLY                    HYP_002489

third party, except as expressly permitted by this Agreement;

(b) remove, modify or obscure any copyright, trademark or other proprietary rights notices (if any) that are present or appear on the Software or that appear during use or installation of the Software.

2.05 **Ownership.** All Licenses granted to Licensee under this Agreement are subject to Licensee's compliance with the terms and conditions of this Agreement. This Agreement does not transfer any ownership rights in the Software and HYPERION reserves all rights not expressly granted.

2.06 **Press-releases.** Subject to common approval, the Parties shall release a joint press-release announcing this Agreement.

### ARTICLE III.
### OBLIGATIONS OF HYPERION

3.01 **Provision of the Software.** Following payment of minimum order as set out in article 2.02 hereof, HYPERION shall immediately provide Licensee with the Software.

3.02 **Follow-up agreement.** HYPERION grants licensee a right of option to negotiate in good faith the terms of a follow up agreement covering additional Kickstart(s) and Workbench versions for the Hardware computer main-boards. License is aware of the fact that HYPERION intends to release an improved version of the Software and is willing to enter into good faith negotiations to procure a license for said improved version of the Software instead of ordering additional licenses pursuant to article 2.03 hereof.

### ARTICLE IV.
### OBLIGATIONS OF LICENSEE

4.01 **Payment Terms.** Licensee shall pay the full amount of all HYPERION invoices by IBAN bank wire transfer, all transfer costs for Licensee. All invoices are payable within thirty (30) days upon receipt.

4.02 **Compliance with License Requirements.** Licensee will inform Licensee's employees, agents, and other individuals who have access to the Software that the Software: (1) is licensed by HYPERION; (2) may only be used subject to the terms and conditions contained in this Agreement; and (3) may not be copied, transferred or otherwise used in violation of such terms and conditions. Licensee will use all commercially reasonable efforts to prevent any unauthorized distribution, copying, use, or pirating of the Software.

### ARTICLE V.
### WARRANTIES AND INDEMNIFICATIONS

5.01 **Warranty and Covenant of Original Development by HYPERION.**

(I) HYPERION represents, warrants and covenants that: (a) it has and shall have sufficient rights to all intellectual property rights in the Software under copyright, trademark, trade

secret, and other applicable law; (b) the Software delivered or licensed to Licensee hereunder is and shall be of original development by (employees of) HYPERION (in the conduct of their duties as employees) or by third parties who prepared such materials for HYPERION pursuant to a contract between HYPERION and said third party and who assigned to HYPERION his or its right, title and interest in the Software to the extent required for the purpose of this Agreement; (c) the Software does not and shall not infringe or otherwise violate any copyright or trade secret of any third party anywhere in the world with the exception of software patents.

(II) If HYPERION receives information concerning an infringement or misappropriation claim related to (part of) the Software, HYPERION shall, at its expense, either (1) procure for Licensee the right to continue to use the allegedly infringing Software, or (2) modify the Software or replace it with a functional equivalent, to make it non-infringing, in which case Licensee must immediately cease using the allegedly infringing Software. If it is commercially unreasonable to procure a license or modify or replace the infringing subset of the Software, HYPERION may opt to remove the infringing functionality from the Software. If, as a result of an infringement or misappropriation claim, Licensee's use of the Software is enjoined by a court of competent jurisdiction, HYPERION will, at its option, either procure the right to continue its use, replace the Software with a functional equivalent, or modify the Software to make it non-infringing; and in the event that HYPERION is unable to provide any of the above through commercially reasonable efforts, HYPERION will refund the amount paid, and terminate the license.  The rights and remedies granted to Licensee under this Article 5.01 state HYPERION's entire liability and Licensee's exclusive remedy with respect to any claim of infringement of the rights of a third party.

5.02 **Limited Warranty and Disclaimers**.

(a) The Software is licensed to Licensee "as is". The foregoing states HYPERION's entire liability and Licensee's exclusive remedy for any breach of the limited warranty described in Article 5.02 hereof.

(b) **NO OTHER WARRANTIES.**   EXCEPT FOR THE LIMITED WARRANTY PROVIDED IN ARTICLE 5.02 (a) ABOVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, HYPERION DOES NOT MAKE ANY REPRESENTATIONS OR EXPRESS WARRANTIES AND DISCLAIMS ALL WARRANTIES, DUTIES AND CONDITIONS WITH RESPECT TO THE SOFTWARE, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, LACK OF VIRUSES, ACCURACY OR COMPLETENESS OF RESPONSES OR RESULTS, OR CORRESPONDENCE TO DESCRIPTION.   THERE ARE NO WARRANTIES OF TITLE, NON-INFRINGEMENT OR QUIET ENJOYMENT OR QUIET POSSESSION WITH RESPECT TO THE SOFTWARE.  THE ENTIRE RISK AS TO THE QUALITY OF OR ARISING OUT OF USE OR PERFORMANCE OF THE SOFTWARE, IF ANY, REMAINS WITH LICENSEE.

(c) **Fault Tolerance.** The Software is not fault-tolerant and is not designed, manufactured or intended for use with on-line control equipment in hazardous environments requiring fail-safe performance, such as in the operation of nuclear facilities, aircraft navigation or communication systems, air traffic control, direct life support machines, or weapons systems, in which the failure of the Software could lead directly to death, personal injury, or severe physical, property or environmental damage ("High Risk Activities"). HYPERION

SPECIFICALLY DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY OF FITNESS FOR HIGH RISK ACTIVITIES.

5.03 **Organization and Standing.** HYPERION is a corporation duly organized, validly existing and in good standing under the laws of the kingdom of Belgium. INDIVIDUAL COMPUTERS GmbH is a corporation duly organized, validly existing and in good standing under the laws of Germany.

5.04 **Power to grant rights by HYPERION**. HYPERION represents and warrants that: (a) it has the right, power and authority to grant the rights and licenses granted in this Agreement and fully perform its obligations hereunder; (b) the making and performance of this Agreement by HYPERION does not and shall not violate any separate agreement, right or obligation existing between HYPERION and any third party.

## ARTICLE VI.
## LIMITATION OF LIABILITY

(a) HYPERION's liability under this Agreement will be limited, to the maximum extent permitted by applicable law, to direct damages up to five thousand (5000) euro. The limitations contained in this Article VI will not apply with respect to the following in connection with the performance of this Agreement:  (1) HYPERION's liability for damages for gross negligence of willful misconduct, to the extent caused by HYPERION or HYPERION's agent and awarded by a court of final adjudication; and (2) HYPERION's obligations under Article VII (Confidentiality).

(b) TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER LICENSEE NOR HYPERION, NOR THE PARTIES' RESPECTIVE AFFILIATES OR SUPPLIERS, WILL BE LEGALLY RESPONSIBLE FOR ANY INDIRECT DAMAGES (INCLUDING, WITHOUT LIMITATION, CONSEQUENTIAL, SPECIAL, PUNITIVE, OR INCIDENTAL DAMAGES, DAMAGES FOR LOSS OF PROFITS OR REVENUES, LOSS OF PRIVACY, BUSINESS INTERRUPTION, OR LOSS OF BUSINESS INFORMATION), ARISING OUT OF THE USE OF OR INABILITY TO USE THE SOFTWARE, OR OTHERWISE UNDER OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR IF SUCH POSSIBILITY WAS REASONABLY FORESEEABLE.  This exclusion of liability in this Article VI (b) does not apply to either Party's liability to the other for violation of its confidentiality obligation or of the other Party's intellectual property rights.

(c) Except as specified expressly in this Article VI, the limitations on and exclusions of liability for damages in this Agreement apply regardless of whether the liability is based on breach of contract, tort (including negligence), strict or product liability, breach of warranty, or any other legal theory, and even if any remedy fails of its essential purpose.

## ARTICLE VII.
## CONFIDENTIALITY

(a) Each Party may disclose to the other Party Confidential Information as may be necessary

to further the performance of this Agreement. Each Party agrees to treat the other's Confidential Information in the manner prescribed herein.

(b) Licensee and HYPERION shall protect the other Party's Confidential Information as follows:

(I) Except as specifically provided herein or otherwise permitted by the other Party in writing, each Party may disclose Confidential Information of the other Party only to those employees and agents required to have knowledge of same to perform their duties pursuant to this Agreement. Each Party shall require each such employee or agent to enter into a written non-disclosure agreement containing provisions substantially consistent with the terms hereof prior to the disclosure of Confidential Information to such employee or agent. Each Party shall treat the Confidential Information of the other Party with the same degree of care as it protects its own Confidential Information, and in no event less than a reasonable degree of care.

(II) Except as may specifically be permitted herein, upon the termination of this Agreement, each Party shall return to the other, or, if so requested, destroy all Confidential Information of the other Party in its possession or control, except such Confidential Information as may be reasonably necessary to exercise the rights that survive the termination of this Agreement.

(c) The foregoing obligations of confidentiality shall not apply with respect to either Party's Confidential Information to the extent that it:

(I)  is within or later falls within the public domain through no fault of the Party receiving the Confidential Information; or

(II) is, or becomes, available to the receiving Party from third parties, who, in making such disclosure, have breached no written confidentiality agreement; or

(III) is previously known by the receiving Party;

(IV) is independently developed by or for the receiving Party without use of the Confidential Information.

(d) In the event any Party receives a request to disclose any Confidential Information under the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or a governmental body, such Party shall (I) immediately notify the Party that furnished such Confidential Information of the existence, terms and circumstances surrounding such request, (II) consult with such Party on the advisability of taking legally available steps to resist or narrow such request, and (III) exercise reasonable best efforts, at the expense of the Party producing such Confidential Information, to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as may be disclosed.

## ARTICLE VIII.
## TERM; TERMINATION

8.01 **Term**. This Agreement shall continue for a period of five (5) years as of the date that the

ATTORNEYS EYES ONLY                    HYP_002493

Hardware goes on sale which shall not exceed a total of seven (7) years as of the Effective Date of this Agreement and unless terminated previously pursuant to this Agreement. The existing license agreement concluded by the Parties on February 25th, 2013, relating to the distribution in Object Form of Kickstart 1.3 and Kickstart 3.1 shall remain in force as amended by this Agreement for as long as the aforementioned agreement of February 25th, 2013 remains in force.

8.02 **Termination for Material Breach**.   Either Party may, at its option, terminate this Agreement in the event of a Material Breach by the other Party. Such termination may be effected only through a written notice to the other Party, specifically identifying the breach or breaches on which termination is based. Following receipt of such notice, the Party in breach shall have thirty (30) days to cure such breach or breaches and this Agreement shall terminate in the event that such a cure is not made by the end of said period. The claim of material breach justifying termination shall be limited to the specific breach set forth in the above written notice as explained, supported by evidence.

8.03 **Termination in the event of bankruptcy**. If either Party files a petition in bankruptcy for liquidation, or ceases doing business in the ordinary course, then the other Party shall have the right to terminate this Agreement upon thirty (30) days written notice.

8.04 **Consequences of Termination**. Upon termination of this Agreement, the license granted to Licensee pursuant to article II hereof shall terminate forthwith. Articles V, VI, VII, VIII and IX shall survive the termination of this Agreement. Upon termination of this Agreement other than for Material Breach by Licensee, Licensee, its distributors and resellers may continue to exercise all of the rights and licenses granted herein in order to (a) furnish maintenance and technical support for the Software (b) fill orders that Licensee or its distributors and resellers have received prior to such date, and (c) distribute their inventory of existing as of such date.

## ARTICLE IX.
## MISCELLANEOUS

9.01 **Entire Agreement**. This Agreement collectively sets forth the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and, except as specifically provided herein, supersedes and merges all prior oral and written agreements, discussions and understandings between the Parties with respect to the subject matter hereof, and neither of the Parties shall be bound by any conditions, inducements or representations other than as expressly provided for herein. The existing license agreement concluded by the Parties on February 25th, 2013, relating to the distribution in Object Form of Kickstart 1.3 and Kickstart 3.1 shall remain in force as amended by this Agreement. For the avoidance of doubt, this Agreement shall not affect the provisions of any other agreements as concluded between the Parties unless the Parties specifically indicate their intent in writing to amend the terms of previously concluded agreements.

9.02 **Independent Contractors**. In making and performing this Agreement, Licensee and HYPERION act and shall act at all times as independent contractors and nothing contained in this Agreement shall be construed or implied to create an agency, partnership or employer and employee relationship between Licensee and HYPERION. At no time shall either Party make commitments or incur any charges or expenses for or in the name of the other Party.

ATTORNEYS EYES ONLY                    HYP_002494

9.03 **Amendments; Modifications**. No amendment, modification or attempt to supersede or cancel any of the terms, covenants, representations, warranties or conditions hereof shall be effective unless such amendment, modification or direction to supersede or cancel such term, covenant, representation, warranty or condition is executed in writing by Licensee and HYPERION or, in the case of a waiver, by or on behalf of the Party waiving compliance. No waiver by any Party of any condition, or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or warranty.

9.04 **Assignment**. Licensee shall not assign this Agreement to any third party (including through operation of law) without HYPERION's prior written approval which shall be not withheld unreasonably.

9.05 **Governing Law**. This Agreement shall be governed by and interpreted in accordance with the internal laws of Belgium without regard to conflicts of laws principles.

9.06 **Forum**. The exclusive jurisdiction and venue of any lawsuit between the parties arising under this Agreement or out of transactions contemplated hereby shall be the courts of Brussels, Belgium and each of the Parties hereby submits itself to the exclusive jurisdiction and venue of said courts for the purposes of such lawsuit. This choice of jurisdiction and venue does not prevent either Party from seeking injunctive relief with respect to a violation of intellectual property rights, confidentiality obligations or enforcement or recognition of any award or order in any appropriate jurisdiction.

9.07 **Counterparts**. This Agreement may be executed in any number of counterparts but at least one for each Party, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one Agreement.

9.08 **Signatures by Facsimile**. Any facsimile signature of any Party hereto shall constitute a legal, valid and binding execution hereof by such Party.

9.09 **Construction**. This Agreement is the product of joint draftmanship and shall not be construed against one Party more strictly than against the other.

9.10 **Effect**. The Agreement shall be binding upon and inure to the benefit of each Party hereto, and their successors and assigns.

9.11 **Headings**. The headings in this Agreement are inserted merely for the purpose of convenience and shall not affect the meaning or interpretation of this Agreement.

ATTORNEYS EYES ONLY

**IN WITNESS WHEREOF**, the Parties, by their authorized representatives, have executed this Agreement.

FOR INDIVIDUAL COMPUTERS GMBH

BY: _____

NAME (PRINTED) _Jens Schönfeld_

TITLE _Geschäftsführer_

FOR HYPERION ENTERTAINMENT CVBA

BY:_____

NAME (PRINTED) _____

TITLE _____

FOR HYPERION ENTERTAINMENT CVBA

BY:_____

NAME (PRINTED) _____

TITLE _____

## EXHIBIT I

Workbench 3.1 shall contain all files of the original "vanilla" Workbench 3.1 floppies including (without limitation):

-      Install
-      Workbench
-      Extras
-      Locale
-      Fonts
-      Storage

Licensee has taken it upon itself to device a method to incorporate said files in a flash-rom as part of the Hardware.

ATTORNEYS EYES ONLY HYP_002497

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Hyperion Invoice to Individual Computers, October 24, 2017,

for License fee "as per OEM license agreement

"Buddha Controller Anniversary Edition" for:

Workbench 1.3, Workbench 2.0, Workbench 2.1, Workbench 3.0

and AmigaOS 3.1

Plaintiffs' Motion for Partial Summary Judgment
Case No. 2:18-cv-00381

**GORDON E. R. TROY PC**
183 Highfield Dr., West Windsor, VT 05089
P.O. Box 1180 Shelburne, VT 05482
(802) 881-0640/Fax: (646) 588-1962



Klantgegevens

| | |
|---|---|
| Hyperion Entertainment CVBA | Individual Computers Jens Schönfeld GmbH |
| Tervurenlaan 34 | Im Zemmer 6 |
| B-1040 Brussel | 52152 Simmerath |
| | Germany |
| VAT BE 0466-380-552 | |
| | VATID: DE257081497 |

| Factuur Nr :   2017/025 | Factuurdatum : 24/10/2017 | Vervaldatum : 23/11/2017 |
|---|---|---|

| Omschrijving | Totaal exl BTW | Totaal incl | BTW 21% |
|---|---|---|---|
| License fee | € 1.000,00 | | |
| as per OEM license agreement "Buddha Controller Anniversary Edition" for : | | | |
| Workbench 1.3, Workbench 2.0, Workbench 2.1, Workbench 3.0, AmigaOS 3.1 | | | |
| A2091 Install Disk | | | |
| no limit on quantities produced of the Budha controller , valid for 5 years | | | |
| | | | |
| BTW VERLEGD | | | |

| | BTW | Totaal exl BTW | Totaal incl BTW |
|---|---|---|---|
| | | € 1.000,00 | |

**Wiring information:**
<u>Beneficiary</u>: Hyperion Entertainment CVBA – Tervurenlaan 34–  B-1040 Brussel
<u>KBC BANK: Account number</u> (IBAN): REDACTED  – SWIFT (BIC) KREDBEBB
<u>Paypal</u>: paypal@hyperion-entertainment.biz

ATTORNEYS' EYES ONLY