# Settlement Agreement

This Settlement Agreement ("Agreement") is made on this 5th day of June, 2026 ("Effective Date"), by and between Amiga Corporation, a Nevada Corporation with Business ID NV20181857100 ("Amiga") and Hyperion Entertainment BV, a Belgian limited liability company with Enterprise Number 0466.380.552 ("Hyperion"). Amiga and Hyperion are sometimes hereinafter referred to individually as a "Party" and jointly as the "Parties."

1. **Definitions.**

a. "68K" means the Motorola 680x0 CPU Architecture and binary-compatible variants, whether in hardware, firmware, or software (including FPGA implementations and software emulation);

b. "Additional Hyperion CPUs" means any CPU architecture (including the PowerPC CPU), but excluding the 68K;

c. "Affiliate" means any "Person" that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control of a Party; and "control" means the right to exercise control over the decisions of such Person, whether through ownership of stock, equity, or otherwise, or the power to direct or cause the direction of the management or policies of such Person. "Affiliate" also includes any partner of an Affiliate in a joint venture;

d. "AMIGA Marks" means the marks owned and/or registered by Amiga containing the term "AMIGA" whether in stylized form (figurative mark) or otherwise (including but not limited to "AmigaOS" and "AmigaOne"), together with the word marks, KICKSTART, WORKBENCH, EXEC, INTUITION, A500, A600, A1200, A4000 and the following design and word-and-design marks: Boing Ball (i.e., the checkered ball), Boing Ball and "Amiga," Hand with Floppy Disk, Slanted "A", Slanted "A" (outline), "Powered by Amiga," Rainbow Tick, and Tilted Red Square, all as listed on Appendix 1 attached hereto and incorporated herein by reference;

e. "AmigaOS 3.1" means the operating system developed by Commodore-Amiga, Inc. for its Amiga line of computers in 1993;

f. "AmigaOS 4" means the operating system developed by Hyperion for the PowerPC which (a) is based in part on the Software, (b) includes any prospective version of the foregoing for the PowerPC and Additional Hyperion CPUs (irrespective of version numbering, e.g., AmigaOS 4.1, 5, 6, 7, etc.), and (c) is not based on a third-party or independently developed operating-system codebase, it being understood that ExecSG does not constitute a third-party codebase;

g. "Amiga Properties" means the trademarks, historical trademarks, properties and product designations listed on Appendix 1 attached hereto and incorporated herein by reference;

h. "Backported Code" means any portion of AmigaOS 4 code that is included in either AmigaOS 3.2 or AmigaOS 3.3 and that is not part of the Software;

i. "Exclusive Licensed Mark" means "AmigaOne";

j. "Licensed Marks" means the Exclusive Licensed Mark, "AmigaOS," and the "Boing Ball" logo mark;

k. "Person" refers to (i) individuals, and (ii) entities, regardless of means or place of formation;

l. "PowerPC" means the Apple-IBM-Motorola PowerPC CPU architecture and binary-compatible variants, whether in hardware, firmware, or software (including FPGA implementations and software emulation);

m. "Related Persons" means a Party's principals, shareholders, directors, officers, employees, independent contractors, and Affiliates, and the principals, shareholders, directors, officers, employees, and independent contractors of such Affiliates;

n. "Software" means: (i) AmigaOS 3.1, including the Software Architecture; (ii) all prior versions thereof; (iii) all improvements, modifications, fixes, and updates thereof, including but not limited to AmigaOS 3.1.3 and AmigaOS 3.1.4 and all fixes and updates thereof (including all improvements, modifications, fixes, and updates incorporated into AmigaOS 3.5 and AmigaOS 3.9); and (iv) all versions of the Kickstart firmware and ROM-resident operating system components;

o. "Software Architecture" means the structure or structures of AmigaOS 3.1, which comprise software components, the externally visible properties of those components (i.e., those assumptions other elements can make of an element, such as its provided services, performance characteristics, fault handling, shared resource usage, and so on), and the relationships between them;

p. "Term" means the period commencing on the Effective Date and terminating, if at all, as provided in Sections 12 or 16.h.iv.B below.

2. **Acknowledgements by the Parties.** Each Party acknowledges and agrees that:

a. Amiga is the exclusive owner of all right, title, and interest in and to the Software, documentation relating to the Software, and the AMIGA Marks. Without limiting the generality of the foregoing, the Software's source code constitutes Amiga's "Confidential Information" and a "trade secret" as defined in Article 2(1) of Directive (EU) 2016/943;

b. Hyperion is the exclusive owner of all right, title, and interest in and to the AmigaOS 4 source code (excluding any portion of the Software and its source code incorporated in AmigaOS 4) and such source code constitutes Hyperion's "Confidential Information" and a "trade secret" as defined in Article 2(1) of Directive (EU) 2016/943; and

c. Hyperion is the exclusive owner of all right, title, and interest in and to the Backported Code source code and such source code constitutes Hyperion's "Confidential Information" and a "trade secret" as defined in Article 2(1) of Directive (EU) 2016/943.

3. **Grant of Rights.** Amiga hereby grants Hyperion:

a. an exclusive, worldwide, royalty-free right and license during the Term:

i. to use and modify AmigaOS 3.1 solely for the purpose of developing AmigaOS 4 for the PowerPC and Additional Hyperion CPUs; and

ii. to advertise, market, sell, and distribute AmigaOS 4 for the PowerPC and Additional Hyperion CPUs, whether as physical or downloadable copies, or as OEM software.

b. The rights granted to AmigaOS 3.1 herein are strictly personal (*intuitu personae*) to Hyperion and may not be assigned or transferred, in whole or in part, and whether by merger, consolidation, dissolution, operation of law, or any other manner, without Amiga's prior written consent. Any purported assignment or transfer in breach of this clause is void and of no effect and confers no right in the Software on any other person. Amiga retains all rights in the Software not expressly granted herein.

4. **Additional Grants.** Amiga hereby grants Hyperion during the Term:

a. a worldwide, royalty-free right to use "Workbench" and "Kickstart" descriptively (i.e., not as trademarks) to refer to the AmigaOS desktop user interface and the AmigaOS firmware and ROM-resident components, respectively;

b. a worldwide, royalty-free right to package, market, and sell AmigaOS 3.1 for the 68K solely for compatibility within AmigaOS 4 for the PowerPC and Additional Hyperion CPUs, provided that Hyperion includes in the AmigaOS 4 end-user license agreement a notice, subject to Amiga's reasonable approval, that all AmigaOS 3.1 components provided with AmigaOS 4 are licensed solely for use within AmigaOS 4 and not for standalone use or use outside of the AmigaOS 4 environment;

c. the right to advertise, market, sell, and distribute downloadable ("Digital Downloads") and physical ("Boxed Versions") copies of AmigaOS 3.2 and AmigaOS 3.3 products for the 68K, and to manufacture Boxed Versions of AmigaOS 3.3, subject to the conditions stated below:

i. For Digital Downloads of AmigaOS 3.2 and AmigaOS 3.3 for the 68K:

ii. For Boxed Versions of AmigaOS 3.2 and AmigaOS 3.3 for the 68K:

iii. Hyperion shall advise Amiga from time to time (but no less than bi-monthly) of the occurrence of

;

iv. Terms of sale shall state the following or equivalent: "AmigaOS 3.*x* may only be purchased by end-users as an upgrade to, or replacement for, a lawfully licensed installation of AmigaOS on 'Classic Amiga' computers or other systems that already run a licensed version of AmigaOS for the 68K."

v. Hyperion shall stop advertising, marketing, distributing, and selling Digital

Downloads and Boxed Versions of AmigaOS 3.2 and AmigaOS 3.3 for the 68K at the end of December 31, 2026 or sixteen months from the date on which AmigaOS 3.3 is released, whichever is later, but in no event later than December 31, 2027 (or such other date as the Parties may agree) (the "Termination Date"). Notwithstanding the Termination Date, Hyperion shall have the right to maintain up to one thousand (1,000) physical copies of AmigaOS 3.3 in stock at the Termination Date and sell off such units in the normal course of business;

d. Notwithstanding anything contained in 4.c above, all 68K products distributed, sold, licensed, or otherwise made available by Hyperion shall be intended solely for use as an upgrade to, or replacement for, a lawfully licensed installation of AmigaOS on "Classic Amiga" computers or other systems that already run a legally licensed version of AmigaOS for the 68K, and Hyperion shall include such restriction in the applicable EULA for each such product.

5. **Limitations on Grants of Rights in AmigaOS 3.1.**

a. In exercising rights in AmigaOS 3.1 granted to Hyperion in Sections 3.a and 4.b above, Hyperion shall not disclose any Software source code to any Person except to its contractors and developers who have a need to know the source code in order to provide services necessary for Hyperion to exercise the rights granted, and only under a written agreement in a form reasonably approved by Amiga containing confidentiality obligations at least as protective as those set forth in this Agreement.

b. Hyperion shall not enter into any agreements with any Person who provides services related to the exercise by Hyperion of the rights granted in Sections 3.a.i, 4.b and 4.c above ("Developer Agreements") pursuant to which such contractors or developers retain rights in their work product. Amiga shall have the right to approve each new form of Hyperion's Developer Agreements prior to deployment. If Amiga does not respond within fourteen (14) days, approval shall be deemed given.

6. **Grant of Rights in Trademarks.**

a. Contingent upon Hyperion's compliance with the conditions and limitations under Sections 3.a, 4.b, and 4.c above, Amiga hereby grants Hyperion during the Term:

i. an exclusive, worldwide, royalty-free, and sublicensable right and license to use the Exclusive Licensed Mark solely for the purposes of manufacturing, marketing, advertising, distributing, and selling AmigaOS 4;

ii. a non-exclusive, worldwide, royalty-free, and sublicensable right and license to use the AmigaOS and "Boing Ball" logo marks solely for the purposes of manufacturing, marketing, advertising, distributing, and selling AmigaOS 4; and

iii. a non-exclusive, worldwide, royalty-free and non-sublicensable right and license to use the AmigaOS and Boing Ball marks solely for the purposes of manufacturing, marketing, advertising, distributing, and selling AmigaOS 3.2 and AmigaOS 3.3.

b. Hyperion shall use commercially reasonable efforts to ensure that any hardware product marketed as capable of running AmigaOS 4 is branded using the Exclusive Licensed Mark, which product and its marketing collateral (whether physical or digital) shall indicate that the Exclusive Licensed Mark is "under exclusive license from Amiga."

c. Following June 5, 2026, Hyperion shall not enter into any sublicense or other agreement with a third party pursuant to which such third party is permitted to use any Licensed Mark for a period exceeding three (3) years without the prior written consent of Amiga.

7. **Additional Obligations of Hyperion.**

a. Following the Effective Date, Hyperion shall:

i. Promptly deliver or cause the delivery to Amiga of all source code for AmigaOS 3.1, 3.1.3, 3.1.4 and of all fixes and updates thereof, together with the revision history and complete documentation, to facilitate copyright registration; it being understood that Hyperion is under no obligation to deliver to Amiga the source code for either AmigaOS 3.2 or AmigaOS 3.3;

ii. Within sixty (60) days, report to Amiga the number of Boxed Versions of AmigaOS 3.2 for the 68K in inventory on March 23, 2026;

iii. Within sixty (60) days, transfer to Amiga or its designee(s) all trademark registrations held by Hyperion in AMIGA Marks, at the expense of Amiga;

iv. Within sixty (60) days, provide Amiga with all agreements Hyperion has entered into with licensees; and

v. Within sixty (60) days, release and terminate any security interest it may have in or against the Licensed Marks, the Software, or any portion thereof.

b. Hyperion shall provide Amiga with a copy of each agreement entered into by Hyperion pursuant to which Hyperion sublicenses any of the rights granted to Hyperion herein, promptly following execution thereof. Such copy may contain redactions of any financial terms.

c. Hyperion shall promptly notify Amiga if it becomes aware of, or reasonably suspects, any unauthorized access to, misappropriation of, or theft of any portion of the Software source code.

d. Hyperion shall release all contractors and developers from any obligations to Hyperion that would prevent them from working with Amiga and assigning to Amiga any work product created under contract with Amiga.

8. **Additional Amiga Obligations.** During the Term,

a. Amiga shall use its best efforts to maintain trademark registrations for and protect the AMIGA mark in the United States and European Union (EUIPO registration), unless blocked from doing so by other trademark claimants.

b. Amiga shall not market, sell, or exploit AmigaOS 3.2 or AmigaOS 3.3 except as mutually agreed by the Parties.

c. Amiga shall not (i) market, sell, modify, enhance, or exploit the Software other than for the 68K; (ii) permit (by license or otherwise) any third party to market, sell, modify, enhance, or exploit the Software other than for the 68K; (iii) use or license others to use the AMIGAOS mark in connection with any operating system, except (A) a 68K operating system, and (B) as a descriptive or historical reference.

d. Amiga shall not commercialize anywhere in the world (including through sub-licensing), distribute (free of charge or otherwise) or make available to the public (free of charge or otherwise), in any way or form (including but not limited to object code and source code form), on any medium (now known or otherwise) and through any means (now known or otherwise), any operating system other than for the 68K exhibiting a software architecture substantially similar to the Software Architecture, to the extent that such Software Architecture is protectable under the copyright laws of the United States.

9. **Mutual Obligation of the Parties.**

a. Promptly following execution of this Agreement, Amiga shall advise the United States District Court, Western District of Washington, that the Parties have agreed to the termination of all litigation in said Court.

b. Hyperion shall assign its Applications, Serial No. 87329448 (AMIGAONE) and Serial No. 87329431 (AMIGAOS) to Amiga, and any such future applications that Hyperion desires to make shall be made in the name of Amiga at Hyperion's expense.

c. The Parties shall come to mutual agreement on copyright and trademark notices to be placed by Hyperion on any Hyperion product, including but not limited to hardware, software, related packaging, manuals, websites, and social media.

10. **Protection of Amiga Trademarks and Copyrights.**

a. Hyperion agrees on behalf of itself and its Related Persons that all uses of the Licensed Marks by Hyperion shall inure solely to the benefit of Amiga, and be on Amiga's behalf.

b. Without limiting the generality of the foregoing, neither Hyperion nor its Related Persons shall, whether during the Term or at any time thereafter:

   i. do anything inconsistent with Amiga's exclusive ownership or control of AMIGA Marks, the Software, or the Amiga Properties;

   ii. attack the title or any other rights possessed by Amiga in and to AMIGA Marks, the Software, or the Amiga Properties;

   iii. ever use, adopt, or register, or attempt to register any trademark, trade name or service mark, or a foreign language equivalent or transliteration that is identical or confusingly similar to AMIGA Marks or Amiga Properties in any country or territory; or

   iv. except as expressly authorized in this Agreement, (A) make any use of AMIGA Marks, the Software, or the Amiga Properties, or (B) sublicense or permit any sublicense of the Licensed Marks, the Software or the Amiga Properties to third parties.

c. If either Party becomes aware that any AMIGA Marks, the Software, AmigaOS 4, or any of the Parties' products have been, are being, or will be infringed, such Party shall promptly notify the other in writing, and the Parties shall determine in good faith the appropriate course of action with respect to such infringement.

d. Hyperion shall assist Amiga, upon Amiga's request and at Amiga's expense, in procuring, protecting, and defending any of Amiga's rights in AMIGA Marks, such

assistance to include without limitation providing specimens of use, affidavits, or declarations deemed necessary or advisable by Amiga in procuring or maintaining trademark registration, or in defending or prosecuting Amiga's rights.

e. Hyperion hereby acknowledges that, as between Hyperion and Amiga, Amiga is the owner of the Amiga Properties (including the Licensed Marks) throughout the world. Notwithstanding the foregoing, Amiga makes no representation, warranty, or covenant regarding the Amiga Properties, including without limitation those relating to title, encumbrance, and non-infringement.

11. **Dispute Resolution**. In the event that either Party believes that the other Party has committed a breach of any provision of this Agreement, that Party shall deliver to the other Party a written notice describing the alleged breach. If the Party receiving the notice disputes the alleged breach, it shall deliver a written notice of dispute within fifteen (15) days after receiving the notice of breach. The Parties shall first attempt to resolve the matter amicably, failing which the Parties shall resolve the matter in accordance with the procedures stated in Appendix 2, which is incorporated herein by reference as if fully stated.

12. **Automatic Termination.**

a. *Termination Trigger*. Without prejudice to any other right or remedy, this Agreement will, given its *intuitu personae* character, automatically terminate if:

i. Hyperion is declared bankrupt in a judgment with *res iudicata*; or

ii. the president of the competent commercial court has deprived Hyperion wholly or in part of the management of all or part of its assets or activities pursuant to Article XX.32 of the Belgian Code on Economic Law.

b. *Reorganization of Hyperion*. Notwithstanding anything contained in Section 12.a above, the application for, opening of, or implementation of a judicial reorganization of Hyperion, whether under a public or a private procedure, by amicable agreement between Hyperion and one or more of its creditors or by collective agreement of Hyperion's creditors, under Book XX of the Belgian Code of Economic Law, or of any analogous proceeding in another jurisdiction whose object is the continuation of Hyperion's business, shall not invalidate the *intuitu personae* character of rights granted under this Agreement and shall not, of itself, constitute a breach of or default under this Agreement, or give Amiga any right to terminate this Agreement or any license granted under it. This Section 12.b does not limit any right or remedy of Amiga arising from a breach of this Agreement by Hyperion, whether the breach occurs before, during, or after any such proceeding, and does not apply to a bankruptcy or liquidation of Hyperion or a transfer of all or part of Hyperion's business or assets under judicial authority, each of which shall be governed by Section 12.a above and Section 16.b below.

13. **Events on Termination.** Upon termination of the Term, however caused, Hyperion shall promptly cease all use of:

i. the Software source code and permanently delete (and instruct and cause its employees, contractors, and developers to permanently delete) all copies and excerpts of the Software source code in its or their possession or control, except to the extent retention is required by applicable law; and

ii. the Licensed Marks and the Software, except that Hyperion shall have the right to advertise, market, distribute, and sell off any existing physical inventory bearing the Licensed Marks for a period of six (6) months from the date of termination.

14. **General Releases**. Each Party, on behalf of itself and its Related Persons, hereby fully and forever releases the other Party and its Related Persons from any and all claims, causes of action, demands, damages, costs, attorneys' fees, or other expenses of any kind that existed at any time on or before the Effective Date ("Released Claims"), but Released Claims do not include any claim that the Releasing Party was unaware of due to concealment of facts by the other Party or its Related Persons that would have given rise to such claim. Neither Party nor its Related Persons shall make any statement or representation in any public forum, whether orally or in writing, that disparages the integrity, character, or competence of the other Party or its Related Persons with respect to the Released Claims**.**

15. **Notices**. Any notice which either Party hereto is required or desires to give to the other shall be in writing and shall be sent pre-paid via express delivery by a reputable service that requires signature upon delivery, but in each case, notice shall also be sent by email to the Parties' last known email addresses. Notice sent via reputable express delivery service shall be deemed effective upon the earlier of signature or two days after sending. Notices to each Party shall be addressed to their last known addresses or to such other addresses as a Party may notify the other Party in writing from time to time.

16. **Construction.**

a. *Amendments in Writing*. No amendment to or modification of this Agreement or any of its terms and conditions shall be valid or binding on the Parties unless made in writing and signed by a duly authorized representative of both Parties.

b. *Assignment*. Neither Party may transfer or assign this Agreement or any of its rights hereunder, or delegate any of its obligations hereunder, whether temporarily or permanently, voluntarily or involuntarily, and whether by merger (where the transferring or assigning Party is the disappearing corporation or entity), consolidation, dissolution, operation of law or any other manner, without the other Party's prior written consent. The non-assigning Party shall have the right to void any purported assignment in violation of this Section 16.b. The foregoing right of the non-assigning Party shall be without prejudice to any other claim the non-assigning Party may have for damages or equitable relief.

c. *Binding Effect*. This Agreement is binding upon and shall inure to the benefit of the Parties and their respective successors, assigns, executors, and administrators, except that no grant, assignment, transfer, pledge, license, or sublicense made by either Party in violation of this Agreement shall vest any rights under this Agreement in the receiving party.

d. *Cumulative Remedies*. All rights and remedies of the Parties, whether at law or in equity, shall be cumulative and none of them shall be in limitation of any other right or remedy.

e. *Effective Date*. If no date is entered on the first line of this Agreement, then the Effective Date shall be the date of signing of the last Party to sign this Agreement.

f. *Enforceability/Severability*. If any provision of this Agreement shall be held void, voidable, invalid, or inoperative, the remaining provisions of this Agreement shall

remain in full force and effect. However, if such void, voidable, invalid, or inoperative provision is a material term or condition of this Agreement, the Parties shall supply a substitute provision, negotiated in good faith, which comes closest to their original intent.

g. *Entire Agreement*. This Agreement is the entire agreement between the Parties relating to the subject matter hereof and supersedes all prior or contemporaneous oral or written communications, proposals, and representations with respect to said subject matter, including but not limited to the Settlement Agreement entered into as of September 30, 2009, by and between Amiga, Inc., Itec, LLC, Amino Development Corporation (the "Amiga Parties") and Hyperion, and assigned to Amiga as of February 1, 2019; provided, however, that the Agreement to Facilitate Settlement entered into as of March 15, 2026, by and between Amiga and Hyperion shall not be superseded by this Agreement and shall remain in full force and effect, except as expressly modified by this Agreement.

h. *Governing Law and Final Arbitration*.

i. Any dispute arising from the interpretation, enforcement, or alleged breach of this Agreement ("Claims") shall be governed by and construed, interpreted, and resolved in accordance with the laws of Belgium without regard to its choice of law provisions.

ii. Except as provided in Section 16.h.ii.D below, the Parties shall first attempt to resolve all Claims through the procedures set forth in Appendix 2 (referenced in Section 11 above). A Claim may be submitted to arbitration under this Section 16 only if:

A. the arbitrator under Section 11 has determined under Section 7.c of Appendix 2 that the breaching Party failed to complete the relief ordered in the Final Award within the Cure Period, or failed to commence and diligently pursue the affirmative steps required to complete it; or

B. the allegedly breaching Party did not dispute the breach within the fifteen (15) day period provided in Section 11 above and has failed to cure the breach or agree to take reasonable affirmative steps toward cure; or

C. a Party has failed or refused to participate in, or to comply with, the procedures set forth in Appendix 2, including refusal to submit to or participate in arbitration thereunder; or

D. the Claim (I) does not allege a breach of this Agreement, (II) concerns only the interpretation of this Agreement or ownership of any right, title, or interest addressed in this Agreement, and (III) seeks only declaratory relief, it being understood that no Party may use this Section 16.h.ii.D to obtain any remedy for breach, in whole or in part, or to avoid the procedures set forth in Appendix 2 for any Claim that alleges a breach or seeks a remedy for breach.

iii. If any of the above conditions are met, the Party asserting the Claim may submit such Claim to final and binding arbitration subject to the following:

A. the arbitration shall be administered by the Belgian Centre for Arbitration and Mediation (CEPANI) under its then-current Rules, which are incorporated

herein by reference. The seat of arbitration shall be Brussels, Belgium, but proceedings shall be held by videoconference unless both Parties agree to appear personally. The arbitration shall be conducted in the English language before a single arbitrator, unless the Parties agree to a panel of three (3) arbitrators. The arbitrator(s) shall be fluent in English, have demonstrable experience conducting arbitration proceedings in English, and have reasonable familiarity with the subject matter of the dispute. Either Party may object to any appointment that does not reasonably meet these requirements; and

B. the arbitrator(s) shall have the authority to grant any remedy available at law or in equity, including injunctive and other equitable relief, and to award the prevailing Party its fees, costs, and reasonable attorneys' fees; provided that in an arbitration submitted under subsection ii.D above, the arbitrator(s) shall have the authority to grant only declaratory relief and to award the prevailing Party its fees, costs, and reasonable attorneys' fees. The authority to award fees and costs under this Section 16.h.iii.B applies only to the arbitration conducted pursuant to Section 16.h.iii, and does not alter the allocation of arbitration fees set forth in Appendix 2. The award of the arbitrator(s) may be entered and enforced in any court of competent jurisdiction.

iv. If, after receiving a notice of an arbitration commenced under this Section 16, a Party fails or refuses to participate in the arbitration (including by failing, without good cause promptly cured, to participate in the appointment of the arbitrator(s), to submit a response or defense, or to appear at any hearing), the arbitrator(s) shall deem such Party to be in default, and the arbitration shall proceed in that Party's absence.

A. In the event of such default by Amiga, Amiga shall be deemed to have irrevocably waived, and shall be estopped from asserting or enforcing in any proceeding of any kind, any right, claim, or defense arising from the facts and circumstances underlying the defaulted Claim, in each case solely as against Hyperion.

B. In the event of a default by Hyperion, Hyperion shall be deemed to have irrevocably waived, and shall be estopped from asserting or enforcing in any proceeding of any kind, any right, claim, or defense arising from the facts and circumstances underlying the defaulted Claim, in each case solely as against Amiga. Additionally, Amiga shall have the right to terminate this Agreement, including all licenses granted to Hyperion hereunder, upon written notice to Hyperion.

C. The waivers referred to in Sections A and B above shall be self-executing upon entry by the arbitrator(s) of a finding of default, shall not require any further award, order, or judicial confirmation, and shall survive any termination or expiration of this Agreement.

i. *Headings*. The section headings in this Agreement are solely for the convenience of the Parties and have no legal or contractual significance.

j. *Independent Entities*. This Agreement does not create a partnership, employment relationship, agency, franchise or joint venture relationship between the Parties.

k. *Presumptions*. This Agreement shall be construed without regard to any presumption or other rule permitting construction against the Party causing this Agreement to be drafted and shall not be construed more strictly in favor of or against either Party.

l. *Rights of Third Parties*. This Agreement shall not be deemed to give any right or remedy to any third party whatsoever.

m. *Signature and Counterparts*. This Agreement shall be digitally signed by the Parties in counterparts through an authentication service such as Docusign, provided that such service is compliant with the ESIGN Act and UETA (for U.S. parties) or eIDAS (for European parties). Said counterparts, taken together, shall constitute one agreement. Neither Party shall be bound by this Agreement until both Parties have duly executed a counterpart hereof.

n. *Survival*. All provisions of this Agreement that contemplate the performance of any obligation following expiration or termination of the Term, together with all provisions that relate to the enforcement of the Parties' rights, each Party's remedies for breach or alleged breach by the other Party of its representations, warranties, covenants, understandings or obligations, and this Section 16, shall survive such expiration or termination.

o. *Waiver*. No waiver of any right or remedy shall be effective unless in writing and signed by an authorized representative of the Party against whom enforcement of the waiver is sought. Neither the failure of either Party to exercise any right, nor the waiver of any default or breach by the other Party, shall constitute a waiver of such right or a waiver of such default or breach with respect to any subsequent default or breach.

WHEREFORE, the Parties hereto execute this Agreement as of the Effective Date.

**Amiga Corporation**

DocuSigned by:
39E8CC4FB36E462...
By: Mike Battilana
Title: President
Date: 2026-07-17 | 03:17:44 PDT

**Hyperion Entertainment BV**

Ondertekend door:
Timothy De Groote
CB54509994C7430...
By: Timothy De Groote
Title: Managing Director
Date: 2026-07-17 | 01:13:23 PDT

# Appendix 1
# Amiga Properties

## A. TRADEMARKS.

AMIGA
AMIGA OS
AMIGAOS
AMIGA ONE
AMIGAONE
POWERED BY AMIGA
AMIGA ANYWHERE
AMIGA DOS
AMIGADOS
AMIGA ENABLED
WORLD OF AMIGA
EXEC
INTUITION
KICKSTART
A500
A600
A1200
A4000
C64
C65
MY64
VIC 20
WORKBENCH
The BOING BALL design mark
The BOING BALL & AMIGA design mark
The HAND WITH FLOPPY DISK design mark
The SLANTED "A" design mark
The SLANTED "A" (outline) design mark
The RAINBOW TICK design mark
The AMIGA design mark
The POWERED BY AMIGA design mark
The AMIGA (with tilted red square on "i") design mark
The TILTED RED SQUARE design mark

## B. HISTORICAL TRADEMARKS.

AMIGAVISION
AUTOCONFIG
BOING
BOING BAG
BOING BALL
CBM
KIM
MOS
MPS
PET
PETASCII
PETSCII
POWER-PLAY ARCADE
POWER STICK
POWER SYSTEM
SHUFFLE PIX
SID
TANK MOUSE
TOPAZ
The MOS design mark
The FIVE HORIZONTAL RAINBOW STRIPES design mark

## C. PROPERTIES AND PRODUCT DESIGNATIONS.

All Amiga-formative domain names.

Short-form Amiga operating system identifiers, including but not limited to “OS3”, “OS4”, “OS5”, etc., except as used by Hyperion to designate “AmigaOS 4” as defined in Section 1.f above.

Amiga operating system internal library revision (also known as “release”) version names, including but not limited to “v34”, “v40”, “v46”, etc.

Amiga chipset and system identifiers, including but not limited to “OCS,” “ECS,” “AGA,” “AA,” “AAA,” “RTG,” “Original Chip Set,” “Enhanced Chip Set,” “Advanced Graphics Architecture,” “Advanced Architecture,” “Advanced Amiga Architecture,” “Retargetable Graphics,” etc.

Computer, peripheral or accessory model identifiers, including but not limited to “C,” “CBM,” “MPS,” “PET,” “SX,” “VIC,” “A,” “X,” “CD,” “Amiga” or “AmigaOne,” optionally followed by one or more digits and/or a variant attribute to denote a model, including but not limited to the following:

| | | |
|---|---|---|
| A1000 | A2620 | KIM-1 |
| A1050 | A2630 | KIM-2 |
| A1060 | A3000 | CHESSMATE |
| A1500 | A3000T | PET 2001 |
| A2000 | A3000UX | CBM 3032 |
| A2000HD | A3630 | CBM 4032 |
| A2031 | A3640 | CBM 8032 |
| A2032 | A4000T | CBM 8096 |
| A2052 | A4091 | CBM 8296 |
| A2058 | A5000 | CBM 8296-D |
| A2060 | A500 PLUS | CBM 510 |
| A2065 | A501 | CBM 610 |
| A2090 | A501+ | CBM 720 |
| A2090A | A520 | VIC 1001 |
| A2090B | A560 | VIC 20 |
| A2091 | A570 | MAX MACHINE |
| A2232 | A590 | CBM 232 |
| A2300 | A601 | CBM V364 |
| A2301 | CD1200 | C16 |
| A2320 | CD1300 | PLUS/4 |
| A2410 | CD1301 | SX-64 |
| A2500 | CDTV | C128 |
| A2500UX | CD32 | JOYBOARD |

# Appendix 2
# Arbitration Agreement

The Parties hereby agree to the following as their Arbitration Agreement under Section 11 of the Settlement Agreement in which this is incorporated ("Arbitration Agreement"):

1. **Definitions**. As used in this Arbitration Agreement,

a. "Answer" means the respondent's written response to the Request, including any counterclaims, filed with the Secretariat and accompanied by the documents on which the respondent then relies;

b. "Arbitration Costs" means the fees and expenses of the Arbitrator and the administrative expenses of CEPANI, as fixed by the Secretariat, for the entire proceeding;

c. "Arbitrator" means the single arbitrator, appointed or confirmed by CEPANI, who presides over both phases of the arbitration;

d. "CEPANI" means the Belgian Centre for Arbitration and Mediation, and "Secretariat" means its Secretariat;

e. "File Transmission Date" means the date on which the Secretariat transmits the file (the Request, the Answer, any counterclaims, and their accompanying documents) to the Arbitrator pursuant to Article 18 of the Rules;

f. "Final Offer" means a Party's sealed written proposal of the complete relief sought for all claims and counterclaims on which breach was found, and shall state (i) a single net amount of monetary relief and any non-monetary relief not prohibited herein; and (ii) for any non-monetary relief proposed, the period within which each element of that relief must be completed (the "Cure Period"). A Final Offer may address the remedy for each claim or counterclaim in separate parts, and may include argument in support of the proposed relief. A Final Offer shall not exceed four (4) A4 pages, double-spaced, in 12-point type, for each claim or counterclaim addressed;

g. "Initial Costs" means the advance on Arbitration Costs that the Secretariat requires to be paid before the file is transmitted to the Arbitrator;

h. "Liability Award" means the written award concluding the Liability Phase, determining for each claim and counterclaim whether the Party charged breached the Settlement Agreement;

i. "Liability Brief" means a brief submitted during the Liability Phase containing the factual claims and arguments pertaining to each claim or counterclaim, not to exceed eight (8) A4 pages, double-spaced, in 12-point type, for a single claim or counterclaim, plus four (4) additional such pages for each additional claim or counterclaim;

j. "Liability Phase" means the first phase of the arbitration, in which the Arbitrator decides whether a breach occurred on each claim and counterclaim;

k. "Notice of Commencement" means the Secretariat's written notice to the Parties that the arbitration has commenced;

l. "Outside Date" means the date 60 days after the File Transmission Date, and is the

deadline for the final award;

m. "<u>Prohibited Relief</u>" means (i) termination, rescission, cancellation, or modification of the Settlement Agreement, in whole or in part; or (ii) the recall, retrieval, withdrawal, or destruction of any physical product that, at the time the relief is requested, is already in production or already in the possession of any distributor or retailer;

n. "<u>Remedy Phase</u>" means the second phase of the arbitration, conducted only if the Liability Award finds a breach, in which the Arbitrator selects between the Parties' Final Offers;

o. "<u>Request</u>" means the request for arbitration submitted to the Secretariat commencing the arbitration, accompanied by a copy of the Settlement Agreement (including this Appendix 2) and the documents on which the claimant then relies; and

p. "<u>Rules</u>" means the CEPANI Arbitration Rules in effect on the date of commencement of the arbitral proceedings.

2. **Agreement to Arbitrate**. Any claim of breach of the Settlement Agreement by a Party shall be resolved by final and binding arbitration before the Arbitrator, administered by CEPANI under the Rules, except as modified by this Section. The language of the arbitration shall be English, and all submissions, communications, hearings, and awards shall be in English. The Arbitrator, however nominated or appointed, shall (i) be fluent in English, (ii) able to conduct the entire proceeding in English, and (iii) have experience with disputes concerning contracts pertaining to intellectual property. The seat of the arbitration shall be Brussels, Belgium. All hearings, conferences, and other appearances in the arbitration shall be held by videoconference, unless both Parties agree in writing to appear in person.

3. **Expedited Procedure**. The arbitration shall be conducted under the expedited procedure provided for in Article 29 of the Rules, regardless of the amount in dispute, and each Party irrevocably waives (i) any right under the Rules to request a determination that the expedited procedure is inappropriate, and (ii) any right under the Rules to request a hearing, without prejudice to any other right it may have under the Rules. If the expedited procedure is determined not to apply, the procedures set out in this Section shall nevertheless govern as the agreement of the Parties to the fullest extent permitted by the Rules and applicable law.

4. **Bifurcation**. The arbitration shall proceed in two phases: the Liability Phase, as described in Section 5 below, and, if liability is found, the Remedy Phase, as described in Section 7 below. The same Arbitrator shall preside over both phases.

5. **Liability Phase**. Sections 5.a and 5.b below take place before the Arbitrator receives the case and are administered by the Secretariat under the Rules. The Arbitrator receives the case at Section 5.c, and the deadlines in Sections 5.d through 5.h run from that date.

a. *Request and Answer*. The arbitration shall be commenced by a Request submitted to the Secretariat. In addition to the information required by the Rules, the Request shall (i) state each claim of breach asserted, the provisions of the Settlement Agreement alleged to have been breached, the facts on which each claim is based, and the relief sought, including the amount of any quantifiable claim, and (ii) be accompanied by the documents on which the claimant then relies, including the Settlement Agreement. The Answer shall be filed within fourteen (14) days after the Notice of Commencement. The Answer must respond to each claim asserted in the Request, and be accompanied by the documents on which the respondent then relies. No claim (other than a

counterclaim) may be pursued in the Liability Phase if it was not asserted in the Request.

b. *Counterclaims*. Counterclaims shall be filed with the Answer and provide the same list of information and documents required to file a Request. Except in the event of a counterclaim that is directly related to the Request, counterclaims not timely asserted under this Section 5 may only be brought in a subsequent proceeding. However, in no event shall an untimely counterclaim jeopardize the Outside Date.

c. *Nomination of the Arbitrator; Transmission of the File*. The Parties shall jointly nominate the Arbitrator within ten (10) days after the Notice of Commencement; failing such nomination, the Arbitrator shall be appointed by CEPANI. Once the pleadings under Sections 5.a and 5.b above are complete, the Arbitrator has been selected, and the Initial Costs have been fully paid, the Secretariat will transmit the file to the Arbitrator, and the Arbitrator shall confirm the File Transmission Date to the Parties in writing.

d. *Procedural Timetable*. The Arbitrator shall establish the procedural timetable within five (5) days after the File Transmission Date and shall adopt in it the deadlines fixed herein, stating the calendar date of each.

e. *Discovery*. Each Party (A) may, within five (5) days after the File Transmission Date, serve up to eight (8) targeted requests for documents, to which the receiving Party shall respond within seven (7) days after service; and (B) shall produce, with its Liability Brief, all documents on which it relies. There shall be no further discovery.

f. *Liability Briefs*. Within twelve (12) days after the File Transmission Date, each Party shall simultaneously serve and file: (i) its Liability Brief; (ii) the documents on which it relies; and (iii) written witness statements, if any. Within seven (7) days thereafter, each Party may simultaneously serve and file a single responsive Liability Brief, together with any responsive documents and witness statements. No further briefing shall be permitted absent order of the Arbitrator.

g. *No Hearing Absent Good Cause*. No hearings shall be held, except that the Arbitrator may, on a motion by a Party for good cause shown, order a hearing not to exceed one day comprising no more than eight (8) hours of hearing time, divided equally between the Parties. Any such hearing shall be held no later than seven (7) days after the deadline for responsive Liability Briefs.

h. Liability Award. Within the later of twelve (12) days after the deadline for responsive Liability Briefs, or seven (7) days from a hearing ordered for good cause shown, the Arbitrator shall issue the Liability Award. The Liability Award shall concisely state the determination as to each claim and counterclaim, and the basis for each determination. No elaborated findings of fact or conclusions of law are required. The Arbitrator shall submit the Liability Award to the Secretariat for scrutiny in sufficient time to issue it within the period fixed by this Section 5.h.

6. **Termination if No Breach Found**. If the Arbitrator finds that no breach occurred on any claim or counterclaim, the arbitration shall terminate immediately upon issuance of the Liability Award, which shall be the final award, and no Remedy Phase shall occur. If the Liability Award determines that a breach occurred on one or more claims or counterclaims, the arbitration

shall proceed to the Remedy Phase, which shall address only the claims and counterclaims on which breach was found.

7. **Remedy Phase.**

a. *Final Offers*. Within seven (7) days after issuance of a Liability Award finding breach, and notwithstanding anything to the contrary in the Rules, each Party shall submit its Final Offer in sealed form to the Arbitrator, who may not open either until both are received or the Final Offer deadline has passed. Once the Arbitrator has confirmed that both Final Offers have been received, the Parties shall exchange their Final Offers. The statements of relief in the Request, Answer, and any counterclaim, while framing the claims and fixing Arbitration Costs, are not part of the Final Offers; provided, however, that the monetary relief payable to a Party pursuant to a Final Offer shall not exceed the quantifiable relief pleaded by that Party for the claims resolved by that offer, together with interest and amounts accruing subsequent to the submission of the relevant pleadings. A Party that fails to submit a timely Final Offer, or whose Final Offer consists entirely of Prohibited Relief (and is therefore treated as not submitted), is in default. No Final Offer may include, and the Arbitrator shall have no power to order, award, or effectuate any Prohibited Relief.

b. *Selection*. Within twelve (12) days after the deadline for Final Offers, the Arbitrator shall select, without modification other than removal of any request for Prohibited Relief, the one Final Offer that the Arbitrator determines most closely conforms to the evidence of record and applicable law (or, where a Party is in default, the other Party's Final Offer), and shall issue a final award incorporating the selected Final Offer. The Arbitrator shall have no authority to award any relief other than what is stated in the selected Final Offer.

c. *Cure*. A Party ordered to provide non-monetary relief shall complete each element thereof within the Cure Period stated in the selected Final Offer. If an element cannot reasonably be completed within the Cure Period, that Party shall, within the Cure Period, commence affirmative steps required to provide complete relief and shall diligently pursue such steps to completion. If the Parties dispute whether an element could reasonably be completed within the Cure Period, or whether the required affirmative steps have been commenced and diligently pursued, either Party may refer the dispute to the Arbitrator by written submission served simultaneously on the other Party, who may respond within seven (7) days. Submissions under this Section shall not exceed four A4 pages, double-spaced, in 12-point type. The Arbitrator shall decide the dispute on the written submissions within fourteen (14) days after the referral. The referral shall be administered by CEPANI as a proceeding under this Arbitration Agreement. If the Arbitrator is unable or unwilling to act, CEPANI shall appoint a replacement to decide the referral. The Arbitrator's determination under this Section shall be final and binding for purposes of Section 16 of the Settlement Agreement.

8. **Outside Date; Extensions.**

a. *Outside Date*. Notwithstanding any time limitations provided in the Rules, it is the intent of the Parties that awards under Section 6 or 7.b shall issue no later than the Outside Date. The Arbitrator shall manage the proceeding, and shall set and enforce all deadlines not fixed herein, so as to meet the Outside Date, and each prospective Arbitrator, prior to appointment, shall be asked to confirm their availability to follow the schedule contained herein.

b. *Extensions*. Notwithstanding the Outside Date, the deadlines set forth herein may be extended by written agreement of the Parties or by order of the Arbitrator on a motion for good cause. This subsection binds the Parties and the Arbitrator; it does not limit any power of the Secretariat under the Rules.

c. *Savings*. Failure of the Arbitrator to issue an award within any period fixed herein, including by the Outside Date, shall not end the Arbitrator's authority, invalidate any award, or constitute grounds to set aside, modify, or refuse enforcement of any award. The time limits fixed by this Section, including the Outside Date, are terms determined by the Parties within the meaning of Article 1713, §2 of the Belgian Judicial Code, and their expiration shall not terminate the mission of the Arbitrator.

9. **Costs and Fees.**

a. If the arbitration is terminated by a finding that the Request fails to state a breach, the Arbitrator shall order the Party filing the Request to pay all costs of arbitration (including to reimburse the other Party for the Initial Costs). If the arbitration is terminated by a finding that both the Request and any counterclaims fail to state a breach, then the Parties shall bear the Arbitration Costs equally. Consequently, if a Party paid more than its share of Initial Costs, the Arbitrator shall order reimbursement by the other Party so that the Parties bear equal shares.

b. If the arbitration includes the Remedy Phase, the Arbitrator shall, as part of the award, apportion Arbitration Costs between the Parties, taking into account the claims and counterclaims asserted, the relief sought, the extent to which each claim and counterclaim succeeded or failed, and any other circumstances the Arbitrator considers relevant.

c. Each Party shall bear its own attorneys' fees, expert fees, and other expenses in presenting its case, none of which the Arbitrator shall have authority to award.

10. **Final and Binding Award**. The award issued under Section 6 or 7.b, as applicable, shall be final and binding, and judgment on the award may be entered in any court of competent jurisdiction.